**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SANDY RAE TERWILLIGER,    )
    )
    Plaintiff,    )
    )    Civil Action No. 13-924
    v.    )
    )    Judge Nora Barry Fischer
COMMISSIONER OF    )
SOCIAL SECURITY,    )
    )
    Defendant.    )

## MEMORANDUM OPINION

### I.    INTRODUCTION

Sandy Rae Terwilliger ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act"). This matter comes before the court on cross-motions for summary judgment. (Docket Nos. 7, 10). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment will be DENIED, and Defendant's Motion for Summary Judgment will be GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on March 25, 2010, claiming a disability onset of May 15, 2008. (R. at 145 – 51, 166, 168).[1] She claimed that her inability to work full-time allegedly stemmed from "back injury," "fibromyalgia," "bipolar," "depression," "anxiety disorder," and "chronic back/neck pain." (R. at 170). Plaintiff was initially denied benefits on July 29, 2010. (R. at 87 – 91). Per the request of Plaintiff, an administrative hearing was held on September 23, 2011. (R. at 41 – 84). Plaintiff appeared to testify, represented by counsel, and a neutral vocational expert also testified. (R. at 41 – 84). In a decision dated October 11, 2011, the ALJ denied Plaintiff the benefits sought. (R. at 14 – 40). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, but this request was denied on April 13, 2013, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 7).

Plaintiff filed her Complaint in this Court on July 1, 2013. (Docket No. 1). Defendant filed an Answer on September 10, 2013. (Docket No. 3). Cross motions for summary judgment followed. (Docket Nos. 7, 10). The matter has been fully briefed, and is ripe for disposition.

## III. STATEMENT OF FACTS

### A. General Background

Plaintiff was born on July 2, 1963, was forty six years of age at the time of her application for DIB, and was forty eight years of age at the time of her administrative hearing. (R. at 208). She graduated from high school, but had no post-secondary education or vocational training. (R. at 49, 171). Plaintiff previously worked as a clerk typist for a mental health treatment facility for approximately four years, her last day of work being in May 2008. (R. at 172). She had additional part-time work experience as a cashier and sales associate with various employers between April 1994 and March 2008. (R. at 172). At the time of her application for

---

[1]    Citations to Docket Nos. 4 – 4-13, the Record, *hereinafter*, "R. at __."

benefits, Plaintiff stated that she had stopped working because of her medical conditions and a prospective relocation. (R. at 171).

When Plaintiff applied for DIB, she was able to engage in some light housework, could go to the bank and store, and would complete puzzle books or read magazines. (R. at 183, 185 – 86). She cared for her dog, and would take it outside. (R. at 184). Plaintiff prepared simple meals on a daily basis, and occasionally cooked. (R. at 185). Plaintiff was able to drive, and usually did so alone. (R. at 186). Plaintiff was living with her husband when she filed for DIB. (R. at 49 – 50). Her husband was employed. (R. at 49 – 50). Plaintiff had three living children, one of whom lived in Plaintiff's home with a boyfriend. (R. at 50, 286, 362 – 63).

B.  Treatment History

On August 16, 2007, neurophysiologist James R. McLaughlin, D.O. performed a nerve conduction EMG study of Plaintiff's bilateral lower extremities. (R. at 407). The study was considered to be normal, without evidence of neuropathy, axonopathy, or radiculopathy. (R. at 407). Reflex, motor, and sensory tests were almost all within normal limits, with the exception of some symptomatic straight leg-raising on the right side. (R. at 408 – 10). No abnormal electrical activity was observed. (R.at 408 – 10).

Records indicate that Plaintiff sought treatment from rheumatologist Devashis A. Mitra, M.D. for her pain. The first treatment note of record was from May 9, 2008. (R. at 253). Plaintiff had a noted history of fibromyalgia[2]. (R. at 253). She complained of increasing pain over the past several months, particularly in her upper arms. (R. at 352). Headaches were also

---

[2]      "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals." Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/ fibromyalgia/basics/definition/con-20019243 (last visited January 17, 2014). "Symptoms sometimes begin after a physical trauma, surgery, infection or significant psychological stress. In other cases, symptoms gradually accumulate over time with no single triggering event." Id.

problematic.  (R. at 253).  Plaintiff stated that the pain was at a moderate level and was primarily weather-related.  (R. at 253).  She denied joint swelling, radicular pain, paresthesia[3], and weakness.  (R. at 253).  A musculoskeletal examination revealed non-tender mild degenerative changes without inflammation, diffuse soft tissue tenderness, and adequate range of motion.  (R. at 253).  She was neurologically nonfocal[4].  (R. at 253).  Plaintiff was noted to be taking prescription Lyrica[5], Ativan[6], and oxycodone[7].  (R. at 253).  Dr. Mitra added Mobic[8] to this regimen.  (R. at 253).  Dr. Mitra's clinical impression was fibromyalgia, poly arthralgias[9], and chronic pain syndrome.  (R. at 253).

On January 15, 2009, Plaintiff returned for evaluation by Dr. Mitra.  (R. at 252).  Plaintiff had not been seen since May 2008, and now complained of severe, diffuse pain.  (R. at 252).  The pain did not radiate, Plaintiff slept reasonably well, and there was no joint swelling, but she experienced morning stiffness for thirty to forty five minutes and had paresthesia in both upper extremities.  (R.at 252).  Plaintiff informed Dr. Mitra that she was now taking prescription

---

[3]  Paresthesia, or "pins and needles," is a burning or prickling sensation in the extremities which may happen without warning and is usually painless.  National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last visited January 14, 2014).

[4]  "A focal neurological deficit is a problem with nerve, spinal cord, or brain function.  It affects a specific location, such as the left side of the face, right arm, or even a small area such as the tongue.  Speech, vision, and hearing problems are also considered focal neurological deficits."  MedlinePlus.  http://www.nlm.nih.gov/medlineplus/ency/article/003191.htm (last visited January 14, 2014).  "In contrast, a nonfocal problem is NOT specific to a certain area of the brain.  It may include a general loss of consciousness or an emotional problem."  Id.

[5]  Pregabalin, also known as "Lyrica," is used for the treatment of nerve and muscle pain due to diabetes, shingles, fibromyalgia, or spinal cord injury.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011830/ (last visited January 17, 2014).

[6]  Lorazepam, also known as "Ativan," is prescribed for the treatment of anxiety, and is a benzodiazepine.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001078/ (last visited January 17, 2014).

[7]  Oxycodone is used to relieve moderate to severe pain, and is a narcotic analgesic.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011537/ (last visited January 17, 2014).

[8]  Meloxicam, also known as "Mobic," is a non-steroidal anti-inflammatory drug commonly used to treat osteoarthritis and rheumatoid arthritis.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011069/ (last visited January 17, 2014).

[9]  Arthralgia is joint pain, and may affect several joints.  MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003261.htm (last visited January 17, 2014).

Percocet[10] and Neurontin[11]. (R. at 252). A musculoskeletal examination revealed no weakness, diffuse soft tissue tender points in the upper and lower extremities, nape of the neck, hips, and lower back, and scattered muscle spasm along the nape of the neck and lower back. (R. at 252). Plaintiff was ordered to submit for lab work and nerve conduction studies. (R. at 252). Prescription Fioricet[12] was added to Plaintiff's prescription regimen. (R. at 252). Dr. Mitra's clinical impression was fibromyalgia, chronic fatigue, muscle spasm, and chronic pain syndrome. (R. at 252).

On February 13, 2009, Plaintiff presented to Linda L. Zulovich, D.O. for a psychiatric evaluation. (R. at 361 – 66). Plaintiff's primary complaints were of anxiety and depression. (R. at 361). Dr. Zulovich noted Plaintiff's history of fibromyalgia-related pain, severe fatigue, difficulty sustaining work activity, and family issues. (R. at 361 – 64). Plaintiff stated that she spent much of each day in her bed. (R. at 361). In the past, Plaintiff had been placed on numerous medications for treatment of depression, anxiety, and difficulty sleeping, but claimed that she had not achieved significant relief from her symptoms. (R. at 362).

During her mental status examination, Dr. Zulovich found Plaintiff to be tangential and, at times, in need of redirection. (R. at 361). Plaintiff was, however, alert and oriented, and displayed appropriate behavior during the exam. (R. at 364). Plaintiff's attention and concentration were considered to be diminished, her mood depressed, her affect anxious and tearful, her speech pressured, and her comprehension questionable. (R. at 364). Her recent and

---

[10]     A combination drug containing oxycodone and acetaminophen, "Percocet" is used for the treatment of moderate to moderately severe pain and is considered a narcotic. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011543/ (last visited January 17, 2014).

[11]     Gabapentin, also known as "Neurontin," is used for the treatment of disorders such as restless leg syndrome and epilepsy, and can relieve pain associated with shingles. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010419/ (last visited January 17, 2014).

[12]     A combination drug comprised of butalbital, acetaminophen, and caffeine, "Fioricet" is used for the treatment of tension headaches and contains a barbiturate. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009376/ (last visited January 17, 2014).

remote memory was intact, her fund of knowledge was appropriate for her educational level, and her judgment was appropriate, but her insight and reliability were minimal. (R. at 364). Plaintiff demonstrated some resistance to treatment because she did not consider herself depressed, and thought that she could simply talk to her friends to resolve personal issues. (R. at 365).

Dr. Zulovich's clinical impression was recurrent, severe major depression, post-traumatic stress disorder ("PTSD"), and generalized anxiety disorder. (R. at 365). Plaintiff received a global assessment of functioning ("GAF") score of 35[13]. (R. at 365). Dr. Zulovich prescribed Pristiq[14], Ativan, and trazodone[15] for treatment. (R. at 366). Plaintiff was also urged to engage in individual counseling, but was not particularly interested in this suggestion. (R. at 366).

Plaintiff was seen twice more by Dr. Zulovich in 2009, in March and April. (R. at 355 – 60). Plaintiff complained of increasing anxiety and a lack of substantial improvement following initiation of her medication regimen with Dr. Zulovich. (R. at 355, 358). Plaintiff stated that she experienced forgetfulness and vertigo. (R. at 358). She endorsed feelings of helplessness and hopelessness, and claimed that she was not sleeping well. (R. at 358). Plaintiff's mental status examinations were generally unchanged from January 2009. (R. at 356, 358). Dr. Zulovich's clinical impression was recurrent, severe major depression, PTSD, and generalized anxiety

---

[13]    The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Id.*

[14]    A selective serotonin and norephinephrine reuptake inhibitor, desvenlafaxine, also known as "Pristiq," is used in the treatment of depression. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009870/ (last visited January 17, 2014).

[15]    Trazodone is an antidepressant medication. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012504/ (last visited January 17, 2014).

disorder.  (R. at 356, 358).  Plaintiff was started on Klonopin[16], Abilify[17], and Elavil[18].  (R. at 356 – 57, 360).  She was continually encouraged to engage in individual counseling.  (R. at 357, 360).  Plaintiff had noted issues with filling her prescriptions at the appropriate times and taking her medications as ordered.  (R. at 355).

On February 24, 2009, Plaintiff was examined by David M. Lobas, M.D. for a neurological consultation.  (R. at 296).  Plaintiff had a known history of fibromyalgia, and complained to Dr. Lobas of years of pain, chronic fatigue, chronic numbness in her toes and fingers, and ongoing depression.  (R. at 296).  Dr. Lobas observed Plaintiff to be alert and in no acute distress.  (R. at 297).  She responded accurately to commands and questions with clear, coherent speech.  (R. at 297).  There was no apparent depression or anxiety.  (R. at 297).  Neurological examination revealed full motor strength, no fasciculations[19] or focal atrophy, intact coordination, unremarkable gait, intact sensation, and intact reflexes.  (R. at 297).  Dr. Lobas concluded that Plaintiff had no current localizing neurological exam deficit.  (R. at 297).  The cause of her diffuse pain symptoms remained uncertain other than her prior diagnosis of fibromyalgia.  (R. at 297).  She was advised to undergo MRI studies of her spine and submit for a bone scan.  (R. at 297).

On March 3, 2009, Dr. McLaughlin performed a nerve conduction EMG study of Plaintiff's bilateral upper extremities.  (R. at 311).  The EMG was considered to be mildly abnormal due to minimal decreased interference patterns in Plaintiff's right triceps.  (R. at 311).

---

[16]    Clonazepam, also known as "Klonopin," is a benzodiazepine medication used for the treatment of seizures, panic disorder, and anxiety.  PubMed Health,  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009677/  (last visited January 17, 2014).

[17]    Apriprazole, also known as "Abilify," is used to treat nervous, emotional, or mental conditions.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000157/ (last visited January 17, 2014).

[18]    A tricyclic antidepressant, amitriptyline, also known as "Elavil," is used from the treatment of depression.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0008944/ (last visited January 17, 2014).

[19]    Fasciculations are muscle twitches. MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003296. htm (last visited January 14, 2014).

It was a "very subtle finding," however, and there was no evidence of neuropathy, axonopathy, or radiculopathy. (R. at 311). Reflex, motor, and sensory tests were generally within normal limits. (R. at 312 – 14).

On March 16, 2009, Plaintiff was evaluated by Sophie Hanna, M.D. at the Center for Pain Relief in Butler, Pennsylvania. (R. at 286). Plaintiff's primary complaint was of generalized body pain, most severe in the lower back and neck, and persisting for at least six months. (R. at 286). Multiple prescription medications had allegedly failed to provide relief from pain. (R. at 286). Plaintiff rated her pain as six on a scale of one to ten. (R. at 286). Plaintiff also described experiencing headaches and dizziness, with some blurred vision accompanying severe pain. (R. at 286). Dr. Hanna observed Plaintiff to be physically well-built and in no acute distress. (R. at 287). Plaintiff arose from a sitting position comfortably, her gait was normal, she had full passive and active range of motion and full strength in all joints of both upper and lower extremities, she had symmetrical reflexes, she had full range of motion in her cervical and lumbar spine, her sensation was intact, and there was no wasting or atrophy of Plaintiff's muscles. (R. at 287). There were, however, multiple tender points on both sides of the body above and below the waist consistent with fibromyalgia, and Dr. Hanna did not suspect symptom magnification. (R. at 287). Plaintiff was otherwise noted to be alert and oriented, and her mood and affect appeared to be normal – with no signs of depression. (R. at 287). MRI studies of Plaintiff's cervical and lumbar spine showed only minimal/mild abnormality. (R. at 287). Dr. Hanna indicated in her notes that Plaintiff had not been taking any medication regularly for fibromyalgia for "at least a couple of years." (R. at 287). Plaintiff was provided prescriptions for Celebrex[20], Lyrica, and Percocet, and was referred for a course of physical

---

[20] Celecoxib, also known as "Celebrex," is a non-steroidal anti-inflammatory medication used for the treatment of mild to moderate pain, stiffness, and swelling associated with arthritis, ankylosing spondylitis, and

therapy – including water therapy. (R. at 287). There is no evidence that Plaintiff followed up with these treatment recommendations or with Dr. Hanna.

Plaintiff returned to Dr. Lobas on March 31, 2009 for a follow-up examination. (R. at 293). Plaintiff continued to complain of pain. (R. at 293). Following a review of her cervical spine MRI results, Dr. Lobas suggested a neurosurgical consultation, but was not certain that surgery was needed. (R. at 293). Dr. Lobas observed Plaintiff to be alert and in no acute distress. (R. at 294). She responded to commands and questions accurately and with clear, coherent speech. (R. at 294). Examination revealed full motor strength, intact coordination, unremarkable gait, intact sensation, and intact reflexes. (R. at 294). In addition to a neurosurgical consultation, Dr. Lobas recommended that Plaintiff continue treatment at a pain center. (R. at 294). He deferred further consultation with Plaintiff, and was not inclined to perform additional examinations for disability purposes. (R. at 292, 294).

On April 7, 2009, Plaintiff was examined by Adnan A. Abla, M.D. for a neurosurgical consultation. (R. at 308 – 10). Dr. Abla had previously evaluated Plaintiff for surgical intervention for lumbar and cervical spine complaints in 2007, at which time it was determined that surgery was not necessary. (R. at 308). Since that time, Plaintiff alleged experiencing low back and bilateral lower extremity pain, as well as some numbness, tingling, and burning in her feet. (R. at 308). Plaintiff was indicated as not having engaged in chiropractic treatment or physical therapy in the past, and she had not tried lumbar injections for pain relief. (R. at 308).

Dr. Abla observed Plaintiff to be well-developed and in no acute distress. (R. at 308). She was alert and oriented. (R. at 308). Significant tightness and tenderness were noted upon palpation of the lumbar spine. (R. at 308). Heel and toe walking were performed without

menstrual cramps. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009526/ (last visited January 17, 2014).

difficulty. (R. at 308). Straight leg-raising elicited pain at sixty degrees. (R. at 308). Following a review of a recent MRI, Dr. Abla concluded that Plaintiff was not a candidate for surgery for her pain, and that she required only conservative treatment in the form of joint injections, aggressive physical therapy, and anti-inflammatory medication. (R. at 309). There was no need for Plaintiff to follow up with Dr. Abla on anything more than an as-needed basis. (R. at 309).

Plaintiff's primary care physician was Joseph A. Gent, M.D., although the record does not include treatment notes for Dr. Gent until September 3, 2009. (R. at 431). On that date, Plaintiff presented to Dr. Gent complaining of burning and pain at the base of her neck and radiating into her shoulders. (R. at 431). The pain was allegedly causing a headache of approximately three weeks duration. (R. at 431). Dr. Gent indicated that Plaintiff had not experienced such problems at any time prior. (R. at 431). Dr. Gent noted Plaintiff to be alert. (R. at 431). She had a full range of motion in the neck, except for extension that caused severe pain in the neck and shoulders. (R. at 431). Plaintiff was not otherwise in discomfort, and was not experiencing any weakness. (R. at 431). X-rays of Plaintiff's spine did not reveal "anything terribly abnormal." (R. at 431). Dr. Gent diagnosed cervical stenosis and prescribed Decadron[21]. (R. at 431).

Plaintiff returned to Dr. Gent on September 11, 2009, complaining about neck pain and related insomnia. (R. at 430). Plaintiff had a full range of motion in the neck, but had discomfort over the C7 level of the spine. (R. at 430). Plaintiff was diagnosed with neck pain and prescribed Neurontin to aid in sleeping. (R. at 430). Dr. Gent also recommended that Plaintiff use a neck collar. (R. at 430). There is no indication that she did so.

Plaintiff was treated for pain by Dr. Gent on three more occasions in October and

---

[21]     Dexamethasone, also known as "Decadron," is a corticosteroid used for the treatment of inflammation. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009872/ (last visited January 17, 2014).

December 2009.  (R. at 426 – 28).  Plaintiff continued to complain of back pain, and Dr. Gent noted that treatment with multiple specialists had failed to pinpoint an exact cause or effective treatment.  (R. at 426 – 28).  Medical imaging studies did not reveal any significant abnormality.  (R. at 426 – 28).  Despite pain in her extremities, Plaintiff did not experience any weakness.  (R. at 426 – 28).  While Plaintiff did exhibit discomfort upon extension and flexion of her back, her motor activity was not otherwise affected by pain.  (R. at 426 – 28).  Plaintiff was also observed to be under significant stress as a result of family-related issues, and Plaintiff described being anxious and depressed.  (R. at 426 – 28).  Plaintiff was to begin seeing a psychiatrist in January.  (R. at 425).  Dr. Gent prescribed Percocet, Relafen[22], Klonopin, Prozac[23], and Wellbutrin[24] for treatment of Plaintiff's physical and mental health issues.  (R. at 426 – 28).  According to Dr. Gent, Plaintiff had no known problems with medications in the past.  (R. at 426 – 28).

On March 23, 2010, Plaintiff complained to Dr. Gent of numbness in her hands and chronic discomfort.  (R. at 424).  Dr. Gent observed no indications of sharp pain, no tenderness over the thoracic spine, and full range of motion in Plaintiff's neck.  (R. at 424).  On May 10, 2010, however, Plaintiff presented to Dr. Gent requiring a wheelchair to get to and from her car and complaining of persistent back pain and weakness.  (R. at 423).  Upon examination, Dr. Gent found that Plaintiff had discomfort in the lumbar spine, but had good strength and intact reflexes.  (R. at 423).  Decadron was prescribed.  (R. at 423).

On May 19, 2010, Plaintiff returned to Dr. Mitra for treatment.  (R. at 434).  Plaintiff had

---

[22]     Nabumetone, also known as "Relafen," is a non-steroidal anti-inflammatory medication used for the treatment of arthritis.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011314/ (last visited January 17, 2014).

[23]     Fluoxetine, also known as "Prozac," is a selective serotonin reuptake inhibitor used for the treatment of depression, obsessive compulsive disorder, and panic disorder, among others.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010346/ (last visited January 17, 2014).

[24]     Buproprion, also known as "Wellbutrin," is an antidepressant medication and may be used for the treatment of seasonal affective disorder.  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009361/ (last visited January 17, 2014).

not been seen since January 2009. (R. at 434). Plaintiff complained of increased pain, particularly in her hands, lower back, bilateral lower extremities, and neck. (R. at 434). Positional hand paresthesias were also experienced. (R. at 434). Her pain, which Plaintiff characterized as severe, was stated to be mostly weather-related. (R. at 434). Plaintiff claimed that her pain forced her to quit working. (R. at 434). Plaintiff denied joint swelling and weakness. (R. at 434). She claimed that Mobic and Neurontin were ineffective, and that she could not tolerate Lyrica. (R. at 434). Physical therapy had also allegedly not provided Plaintiff with lasting benefit. (R. at 434). Dr. Mitra noted that Plaintiff's laboratory studies were relatively normal, that her sleep patterns had improved, and that pain management had offered no treatment to Plaintiff beyond injections. (R. at 434). A musculoskeletal examination revealed non-tender joints without active inflammation, diffuse soft tissue tenderness with paraspinal spasm, and adequate hand closure and peripheral range of motion. (R. at 435). Plaintiff was neurologically nonfocal. (R. at 435). Dr. Mitra considered Plaintiff to be stable, but symptomatic. (R. at 435). Conservative treatment was to be continued, and Dr. Mitra added Daypro[25] and Norflex[26] to Plaintiff's medication regimen. (R. at 435).

On June 15, 2010, Plaintiff returned to see Dr. Zulovich for the first time in over a year. (R. at 437 – 39). She complained of significant family and financial stressors. (R. at 437). She stated that her sleep and appetite had improved. (R. at 437). Dr. Zulovich observed Plaintiff to be alert and oriented, with appropriate speech, attitude, and behavior. (R. at 437). Attention and concentration were diminished, mood was depressed, affect was somewhat anxious, and

---

[25]    Oxaprozin, also known as "Daypro," is a non-steroidal anti-inflammatory medication used for the treatment of inflammation, swelling, stiffness, and joint pain associated with arthritis. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011524/ (last visited January 17, 2014).
[26]    Orphenadrine, also known as "Norflex," is a muscle relaxant used to alleviate stiffness, pain, and discomfort associated with strains, sprains, and other injury. PubMed Health, http://www.ncbi.nlm.nih.gov /pubmedhealth/PMHT0001314/ (last visited January 17, 2014).

comprehension was questionable. (R. at 437). Plaintiff described experiencing some suicidal ideation. (R. at 437). Dr. Zulovich's clinical impression was recurrent, severe major depression, PTSD, and generalized anxiety disorder. (R. at 437). Plaintiff's medications were adjusted, and she was advised to consider individual therapy. (R. at 438). Plaintiff was seen once more in 2010 by Dr. Zulovich in September. (R. at 492 – 94). She reported increased anxiety and depression. (R. at 492). Mental status examination results and diagnoses remained the same. (R. at 492). Plaintiff's medications were adjusted, and included the addition of Lexapro[27]. (R. at 493).

On August 18, 2010, Plaintiff was again evaluated by Dr. Mitra. (R. at 475). Dr. Mitra noted that Plaintiff complained of increased pain in the neck and bilateral upper and lower extremities, and mild swelling in the knees. (R. at 475). Plaintiff claimed that the pain was severe and had an impact on her activities of daily living. (R. at 475). Dr. Mitra noted that Plaintiff no longer followed with a pain management specialist, neurologist, or neurosurgeon. (R. at 475). A musculoskeletal examination revealed degenerative changes without active inflammation, diffuse soft tissue tenderness with paraspinal spasm, and adequate hand closure and peripheral range of motion. (R. at 476). Plaintiff was symptomatic, but her conditions were stable. (R. at 476). Plaintiff was advised to continue with her conservative treatment regimen. (R. at 476).

On January 14, 2011, Plaintiff presented to Dr. Gent for complaints of thigh pain that Dr. Gent ultimately attributed to a pinched nerve. (R. at 468). Otherwise, Dr. Gent found physical examination results to be normal, Plaintiff's strength to be good, flexion and extension of the back to be unremarkable, and straight leg-raising to be negative. (R. at 468). Dr. Gent also

---

[27]    Escitalopram, also known as "Lexapro," is a selective serotonin reuptake inhibitor prescribed for the treatment of depression and generalized anxiety disorder. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010165/ (last visited January 17, 2014).

found no neurological deficits. (R. at 468). Neurontin, Percocet, and Decadron were prescribed. (R. at 468).

On January 31, 2011, Plaintiff returned for evaluation by Dr. Zulovich. (R. at 489 – 91). She explained that she was stressed by significant family issues, and that "her life is miserable and she hates it." (R. at 489). She expressed to Dr. Zulovich that she no longer wished to take so many medications, and that she had voluntarily ceased taking some of it for some time. (R. at 489). Dr. Zulovich stressed that Plaintiff needed to take her medications as prescribed in conjunction with individual counseling. (R. at 490). Plaintiff cited her finances as a reason for not wanting to engage in counseling. (R. at 490). Upon examination, Dr. Zulovich observed Plaintiff to be alert and oriented with appropriate attitude and behavior. (R. at 490). Attention and concentration were somewhat diminished, mood was somewhat depressed, affect was blunted, speech was somewhat pressured at times, and comprehension was questionable. (R. at 490). Plaintiff endorsed experiencing some suicidal ideation. (R. at 490). Dr. Zulovich's clinical impression was recurrent, severe major depression, PTSD, and generalized anxiety disorder. (R. at 490). Dr. Zulovich noted that Plaintiff was not taking her medications properly, and that she needed to enter individual counseling. (R. at 491). Plaintiff's medications were adjusted. (R. at 490).

Plaintiff was seen again by Dr. Zulovich on three other occasions in March, July, and September 2011. (R. at 482 – 88, 497 – 98). Plaintiff continued to complain of worsening symptoms. (R. at 482 – 88). However, Dr. Zulovich specifically noted that Plaintiff was not compliant with her medication regimen, and discussed "the fact that [Plaintiff] took herself off the medication that was specifically for depression and anxiety." (R. at 482, 484 – 85). Dr. Zulovich was "not surprised that [Plaintiff] is not doing well." (R. at 485). Dr. Zulovich also

questioned the veracity of Plaintiff's reports of increased suicidal ideation in conjunction with certain medication. (R. at 485).

Plaintiff returned to Dr. Gent on February 7, 2011 complaining of pain radiating into her legs while sitting. (R. at 466). Examination revealed pain in the lower back and over the knees, but not over the legs. (R. at 466). Straight leg-raising was positive bilaterally, and gait was slow and deliberate. (R. at 466). However, Plaintiff did not grimace when walking and had no issues with balancing. (R. at 466). An x-ray of Plaintiff's spine was unremarkable. (R. at 466). Vistaril[28] and Percocet were prescribed. (R. at 466).

At an April 21, 2011 appointment with Dr. Mitra, Plaintiff stated that her pain was mild, but could become moderate with physical activity. (R. at 477). Plaintiff stated that she was not experiencing side effects from her medications. (R. at 477). Her fatigue was mild and her sleep had improved. (R. at 477). Plaintiff was considered to be stable, although she complained of visual changes. (R. at 477). A musculoskeletal examination revealed scattered areas of soft tissue tender points and some muscle spasm, but there was no inflammation of any joint. (R. at 478). Voltaren[29] was added to Plaintiff's medication regimen. (R. at 478).

Plaintiff's last record of treatment with Dr. Gent was dated March 11, 2011. (R. at 465). She made vague claims of numbness and paresthesias in her hands. (R. at 465). Plaintiff had no loss of motor function and sensation was intact. (R. at 465). Plaintiff appeared "somewhat depressed." (R. at 465). Dr. Gent felt that Plaintiff had trouble concentrating during the examination. (R. at 465).

---

[28]     Hydroxyzine, also known as "Vistaril," is an antihistamine used for the treatment of anxiety, tension, nervousness, and nausea, among other conditions. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000905/ (last visited January 17, 2014).

[29]     Diclofenac, also known as "Voltaren," is a non-steroidal anti-inflammatory medication prescribed for treatment of mild to moderate pain and symptoms of arthritis. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000561/ (last visited January 17, 2014).

On August 2, 2011, Plaintiff was examined by Oksana Palatna, D.O. for a neurological evaluation regarding possible multiple sclerosis. (R. at 502 – 06). Plaintiff complained of visual problems, lightheadedness, dizziness, headaches, and constant severe pain in the upper and lower extremities. (R. at 502 – 03). Plaintiff was very emotional during the evaluation, and Dr. Palatna had difficulty establishing a rapport. (R. at 502). "Every question I ask her she had problems." (R. at 502). Dr. Palatna observed Plaintiff to be "well kept," and she had a "nice professional manicure done as well as a pedicure." (R. at 503). Plaintiff was alert and oriented, but she appeared depressed and drowsy. (R. at 503). Dr. Palatna questioned whether Plaintiff might be overmedicated. (R. at 503). Plaintiff's pupils were equally reactive to light, and extraocular muscle movement was intact. (R. at 503). She had full strength in all extremities, symmetrical reflexes, intact coordination, stable gait, and decreased pin-prick sensation. (R. at 503). Dr. Palatna's clinical impression was persistent fatigue and chronic pain potentially attributable to a history of fibromyalgia, a history of seizure-like episodes, and depression. (R. at 504). Plaintiff was advised to have blood work, an MRI of the spine, and an EEG. (R. at 504). She was to follow up with Dr. Palatna following these tests. (R. at 504). There is no indication that Plaintiff did so. However, an MRI of the cervical spine dated August 15, 2011 revealed normal cervical spine stature and alignment, and only a small paracentral disc herniation at C5-C6. (R. at 505).

On August 15, 2011, Dr. McLaughlin conducted an EEG study of Plaintiff. (R. at 507 – 08). The study was mildly abnormal during awake, drowsy, and stage I sleep periods. (R. at 507). This finding was considered to be a common secondary effect of medications, particularly benzodiazepines and barbiturates. (R. at 507).

Plaintiff's last visit with Dr. Mitra on record was on August 24, 2011. (R. at 479).

Plaintiff complained of an increase in pain – particularly in the hands – and diffuse swelling. (R. at 479). The pain was only mild to moderate, but was allegedly affecting Plaintiff's activities of daily living. (R. at 479). Plaintiff denied specific joint swelling, radicular pain, and weakness. (R. at 479). A musculoskeletal examination revealed non-tender joints without active inflammation, tight hand closure and peripheral range of motion, diffuse soft tissue tenderness, and paralumbar spasm. (R. at 480). Dr. Mitra considered Plaintiff's conditions to be stable, but "somewhat symptomatic." (R. at 480). Conservative therapeutic measures continued to be endorsed by Dr. Mitra. (R. at 480). An increased dosage of Neurontin was suggested. (R. at 480).

C.  Functional Capacity Assessments

On July 16, 2010 a consultative physical examination of Plaintiff was completed by Dennis Demby, M.D. (R. at 441 – 43). Dr. Demby noted that Plaintiff complained of fibromyalgia-related symptoms persisting for many years and affecting mostly her back. (R. at 441). Plaintiff also described experiencing numbness in her feet and pain in her hands. (R. at 441). Plaintiff stated that using stairs increased her pain, standing more than fifteen to twenty minutes increased pain, and sitting for half an hour increased pain. (R. at 441). Plaintiff complained of dizziness, but was unable to describe when or why it occurred. (R. at 441). Dr. Demby noted that Plaintiff had a "fully even tan throughout." (R. at 443). He was unable to take Plaintiff's blood pressure due to complaints of pain caused by the pressure of the cuff. (R. at 441).

Upon examination, Dr. Demby indicated that Plaintiff was neither confused nor fainting. (R. at 441). Her orientation, memory, attention, language, and fund of knowledge were normal. (R. at 442). Plaintiff was oriented, appropriate, and neither anxious nor depressed. (R. at 442).

17

Judgment and insight were intact.  (R. at 442).  Speech was slowed and decreased in volume.  (R. at 442).  Plaintiff's gait and station were normal, as was her motor strength, muscle tone, and muscle bulk.  (R. at 442).  No involuntary movements were witnessed.  (R. at 442).  Plaintiff was in no acute distress.  (R. at 442).  An eye examination revealed normal sclera and conjunctiva, normal pupils, intact extraocular movements, normal optic disc, and no retinal hemorrhages, vessel changes, or exudates.  (R. at 442).  There was no visible abnormality of the lumbar spine upon examination and lumbar spine alignment was normal; however, lumbar flexion and extension were limited and painful, and straight leg-raising was positive bilaterally.  (R. at 442 – 43).  Coordination was normal and reflexes were intact.  (R. at 443).  It was Dr. Demby's opinion that Plaintiff could lift and carry twenty pounds frequently, stand and walk four to six hours of an eight hour work day, sit four to six hours, engage in limited pushing and pulling with the upper and lower extremities, engage in occasional climbing, stooping, crouching, and kneeling, and frequent balancing, but no crawling.  (R. at 443).

On July 26, 2010, state agency evaluator Jan Melcher, Ph.D. completed a Mental Residual Functional Capacity Assessment ("RFC") of Plaintiff.  (R. at 445 – 47).  Based upon her review of the medical record, Dr. Melcher believed that the evidence supported finding impairment in the way of affective disorder and anxiety-related disorder.  (R. at 445).  She found that Plaintiff was not significantly to – at most – only moderately limited in all areas of functioning.  (R. at 445 – 46).  Dr. Melcher noted that Plaintiff had no history of hospitalization for mental illness.  (R. at 447).

Treatment records demonstrated that Plaintiff had intact basic memory processes, she could understand, retain, and follow simple job instructions, she could make simple decisions, she could maintain attendance and punctuality, she could ask simple questions and accept

instruction, and she could maintain socially appropriate behavior. (R. at 447). Dr. Melcher further found Plaintiff to be self-sufficient, and capable of functioning in production-oriented jobs requiring little independent decision-making. (R. at 447). Although stress exacerbated Plaintiff's mental impairments, this could be minimized by limiting her exposure to stressful job environments and exposure to the general public. (R. at 447). Dr. Melcher's ultimate conclusion was that Plaintiff was able to engage in substantial gainful activity not requiring complicated tasks. (R. at 447).

On March 10, 2011, Plaintiff was evaluated by Dr. Zulovich for purposes of filling out a form indicating Plaintiff's degree of mental functional limitation. (R. at 487 – 88, 497 – 98). She noted Plaintiff's diagnoses as "probable" mixed, severe affective bipolar disorder, recurrent, severe major depression, PTSD, generalized anxiety disorder, and "probable" obsessive-compulsive disorder. (R. at 487). A mental status examination revealed that Plaintiff was alert and oriented, and exhibited appropriate attitude and behavior. (R. at 487). Plaintiff's speech was also appropriate. (R. at 487). However, Plaintiff's attention and concentration were diminished, her mood depressed, her affect blunted, and her comprehension questionable. (R. at 487). Dr. Zulovich indicated that Plaintiff would have marked limitation with carrying out detailed instruction, responding appropriately to pressures in a usual work setting, and responding to changes in a routine work setting. (R. at 497). She was otherwise – at most – moderately limited in the remaining areas of functioning. (R. at 497). Dr. Zulovich further opined that Plaintiff had short-term memory issues and difficulty focusing. (R. at 497 – 98). She believed that Plaintiff's pain negatively affected her ability to work. (R. at 498).

On March 11, 2011, Dr. Gent completed a check-box form relative to Plaintiff's degree of physical functional limitation. (R. at 499 – 500). Plaintiff was found capable of only

occasionally lifting and carrying two to three pounds, standing and walking one to two hours per day, and sitting less than six hours. (R. at 499). Plaintiff could only perform limited pushing and pulling with the upper and lower extremities. (R. at 499). She could never kneel or climb, and could only occasionally bend, stoop, or crouch. (R. at 500). Dr. Gent indicated that Plaintiff's ability to reach, handle, finger, feel, see, hear, speak, taste, smell, and maintain continence would all be affected by her conditions, but he did not indicate how. (R. at 500). Plaintiff also needed to avoid heights, moving machinery, temperature extremes, wetness, and dust. (R. at 500). Dr. Gent briefly opined that Plaintiff had no stamina, had only two good days per month during which she could be expected to engage in the above activities, and was bed-ridden on her bad days. (R. at 499 – 500).

   D. <u>Administrative Hearing</u>

   At her hearing, Plaintiff explained that she left her previous employment because she was having problems with her back, neck, arms, legs, and vision.[30] (R. at 53). She claimed to have taken family medical leave several times. (R. at 53). Plaintiff stated that she had missed a significant amount of work for doctors' appointments, and that she began to have trouble driving to work. (R. at 54). On one occasion, her symptoms were so bad that she required the help of co-workers to carry her up the stairs to her office because she could not ambulate without a wheelchair. (R. at 54).

   Plaintiff testified that she was constantly in pain, and that she was typically unsure whether she would be able to get out of bed from day to day. (R. at 55). Plaintiff had past diagnoses of depression, anxiety, and bipolar disorder in addition to her fibromyalgia. (R. at 55). She experienced burning in the spine, numbness in the hands, difficulty controlling her left hand,

---

[30]      Equivocally, Plaintiff also testified that she resigned her position in anticipation of a move for her husband's job; however, the move had yet to occur. (R. at 55). It was Plaintiff's belief, however, that she would have eventually been terminated because her ailments interfered with her ability to work. (R. at 55).

and poor vision. (R. at 56). She had no completely pain-free days. (R. at 57). On a scale of one to ten, Plaintiff described her pain as a seven or eight most days of the week. (R. at 57). Plaintiff also complained of swelling in her hands and feet on a daily basis. (R. at 61). Plaintiff recounted falling on several occasions due to allegedly poor balance. (R. at 62). Doctors have yet to pinpoint a cause for Plaintiff's complaints of poor vision. (R. at 63).

Plaintiff claimed that her medications provided her with little relief in spite of frequent adjustments to her regimen, and were responsible for side effects including weight gain and allergic reactions. (R. at 50, 57 - 59). Treatment at a pain clinic was not helpful, and injections, a TENS unit, and physical therapy allegedly provided no lasting relief. (R. at 58 – 59). Plaintiff stated that her pain was not aggravated by anything in particular, and that she had to lie down between two and four hours per day. (R. at 60). She had used a walker and wheelchair in the past to help her to move. (R. at 74). Despite having a walker in her home, she claimed to crawl to her bathroom from her bed on bad days. (R. at 74 – 75).

Plaintiff testified that her psychological conditions prevented her from leaving the house for anything other than doctors' appointments. (R. at 65). She no longer liked to be in public or around groups of people. (R. at 66). If she was shopping for groceries and the store became too crowded, she would simply leave. (R. at 66). She also spoke of difficulty sleeping, constant racing thoughts, poor memory, inability to focus, and suicidal ideation. (R. at 66 – 67). Plaintiff generally felt helpless and worthless. (R. at 69). Plaintiff had been urged by Dr. Zulovich to attend individual counseling, but did not do so because of an alleged lack of funds. (R. at 69). She did not actually know the cost of counseling sessions, but estimated them to be approximately fifty dollars per visit. (R. at 76). Plaintiff did not explore alternative means of pursuing counseling. (R. at 76). Plaintiff did use a personal tanning bed in her home to combat

claimed "seasonal affective disorder." (R. at 72). She also continued to follow with Dr. Zulovich for medication management. (R. at 68).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a significant number of jobs would exist in the national economy for a hypothetical person of Plaintiff's age, educational level, and work background if limited to light work, only occasional pushing and pulling with the upper and lower extremities, no climbing of ropes, ladders, and scaffolds, crawling, or kneeling, only occasional use of ramps or stairs, or balancing, stooping, or crouching, no exposure to dangerous machinery and unprotected heights, work involving understanding, remembering, and carrying out simple instructions and performing simple routine tasks, only occasional interaction with co-workers and the public, and work in a low-stress environment with no production-rate pace work, and only occasional routine changes. (R. at 79). The vocational expert replied that such an individual could work as a "linen folder," with 100,000 positions available in the national economy, as a "garment packer," with 60,000 positions available, or as a "remnant sorter," with 75,000 positions available. (R. at 80).

The ALJ further inquired whether the same individual would find work at the sedentary – rather than light – level. (R. at 80). The vocational expert responded that such a person could work as a "surveillance systems monitor and alarm monitor," with 350,000 positions available in the national economy, as a "mail sort[er]," with 150,000 positions available, or as a "clerical sorter," with 60,000 positions available. (R. at 81). The addition of a sit/stand option for the hypothetical person every hour would not alter these job numbers. (R. at 81). If the hypothetical person were limited to no work-related interaction with the public or co-workers, and only occasional supervision in a largely isolated environment, the job of "surveillance system monitor" would be eliminated. (R. at 82). Nonetheless, approximately 200,000 "assemblers"

positions would be available in the national economy, in addition to the others earlier mentioned. (R. at 82). Lastly, if the hypothetical person would be off-task at least twenty-five percent of any given work day or would be absent at least one day per week, he or she would not be able to engage in substantial gainful activity. (R. at 82).

## IV.   STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age,

education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[31], 1383(c)(3)[32]; *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 800 (W.D. Pa. 2012) (citing *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999)). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Gaddis v. Comm'r of Soc. Sec.*, 417 F. App'x 106, 107 n. 3 (3d Cir. 2011) (citing *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002)).

Substantial evidence is defined as "'more than a mere scintilla'; it means 'such relevant evidence as a reasonable mind might accept as adequate'" to support a conclusion. *Hagans v. Comm'r of Soc. Sec.*, 694 F. 3d 287, 292 (3d Cir. 2012) (quoting *Plummer v. Apfel*, 186 F. 3d 422, 427 (3d Cir. 1999)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Id.* (citing *Fargnoli v. Massanari*, 247 F. 3d 34, 38 (3d Cir.

---

[31]      Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[32]      Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

2001)); 42 U.S.C. § 405(g). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947)). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, even where this court acting *de novo* might have reached a different conclusion, "so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Medical Center v. Sebelius*, 566 F. 3d 368, 373 (3d Cir. 2009) (quoting *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1191 (3d. Cir. 1986)).

## V. DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairment in the way of fibromyalgia, chronic pain syndrome, chronic fatigue syndrome, major depressive disorder, PTSD, generalized anxiety disorder, bipolar disorder, and obsessive compulsive disorder. (R. at 16). As a result of said impairments, the ALJ concluded that Plaintiff would be limited to sedentary work, except that:

> she can only occasionally push or pull with all extremities, to include the operation of foot controls; requires a sit/stand option at the work station, with intervals of position change no more frequent than every hour; can never climb a ladder, rope or scaffold, kneel, or crawl; can only occasionally climb ropes [sic] and stairs; can only occasionally balance, stoop, or crouch, must avoid even moderate exposure to dangerous machinery, unprotected heights, and like hazards; is limited to understanding, remembering, and carrying out simple instructions and performing simple, routine tasks; is limited to no work-related interaction with co-workers and the public, with only occasional supervision, such that the work would be essentially isolated; and is limited to a low stress work

environment, which means no production rate pace work, but, rather, goal-oriented work with only occasional and routine change in work setting.

(R. at 19). Nevertheless, based upon the testimony of the vocational expert, the ALJ found that Plaintiff would be capable of engaging in substantial gainful activity in a variety of jobs existing in significant numbers in the national economy. (R. at 34 – 35). Plaintiff was not, therefore, awarded benefits. (R. at 36). Plaintiff objects to this decision by the ALJ, arguing that the ALJ erred in failing to accord proper weight to the findings of Drs. Gent and Zulovich, and to Plaintiff's subjective complaints of pain and limitation stemming from her fibromyalgia. (Docket No. 8 at 6 – 16). Defendant counters that the ALJ's decision was properly supported by substantial evidence, and should be affirmed. (Docket No. 11 at 10 – 14). The Court agrees with Defendant.

Plaintiff begins by asserting that Dr. Gent and Dr. Zulovich's functional capacity assessments were consistent with the objective medical evidence of record, and should have been accorded full weight by the ALJ. (Docket No. 8 at 6 – 12). It has been established in this circuit that a treating physician's opinions may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F. 3d 352, 355 (3d Cir. 2008) (quoting *Morales v. Apfel*, 225 F. 3d 310, 317 (3d Cir. 2000)); *Plummer v. Apfel*, 186 F. 3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F. 2d 1348, 1350 (3d Cir. 1987)). However, "the opinion of a treating physician does not bind the ALJ on the issue of functional capacity." *Chandler v. Comm'r of Soc. Sec.*, 667 F. 3d 356, 361 (quoting *Brown v. Astrue*, 649 F. 3d 193, 197 n. 2 (3d Cir. 2011)). A showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less

weight. *Brownawell*, 554 F. 3d at 355. Moreover, a medical opinion is not entitled to any weight if unsupported by objective evidence in the medical record. *Plummer*, 186 F. 3d at 430 (citing *Jones v. Sullivan*, 954 F. 2d 125, 129 (3d Cir. 1991)).

While it is Plaintiff's contention that the ALJ cited little relevant evidence to counter Dr. Gent's findings that fibromyalgia-engendered limitations precluded Plaintiff from work, what the ALJ clearly discussed was that there was little evidence of fibromyalgia-related symptoms in any objective treatment records – including Dr. Gent's – which supported the degree of limitation Dr. Gent found. On his largely check-box form, Dr. Gent made limitations findings that Plaintiff could only occasionally lift and carry two to three pounds, stand and walk one to two hours per day, and sit less than six hours. (R. at 499). Dr. Gent also indicated that Plaintiff's ability to reach, handle, finger, feel, see, hear, speak, taste, smell, and maintain continence would all be affected by her conditions, although he did not indicate how. (R. at 500). Additionally, Dr. Gent briefly opined that Plaintiff had no stamina, had only two good days per month during which she could be expected to engage in the above activities, and was bed-ridden on her bad days. (R. at 499 – 500).

As recounted by the ALJ in his decision, aside from Plaintiff's personal claims of being largely restricted to bed during the day, objective treatment records from Dr. Mitra, Dr. Lobas, Dr. Hanna, Dr. Abla, Dr. Palatna, Dr. McLaughlin, Dr. Demby, and Dr. Gent, himself, did not include findings suggesting anywhere near this level of debilitating limitation. (R. at 21 – 33). Plaintiff's pain was frequently indicated to be mild to moderate. (R. at 21 – 33). Her treatment was considered to be conservative. (R. at 21 – 33). Dr. McLaughlin's diagnostic studies were – at most – mildly abnormal. (R. at 21 – 33). Multiple doctors noted that Plaintiff had normal strength, intact reflexes and sensation, intact coordination, full range of motion, and no atrophy

or wasting. (R. at 21 – 33). Diffuse tenderness was frequently found and attributed to Plaintiff's fibromyalgia, but Plaintiff fails to indicate where in the record this was determined to leave Plaintiff utterly bed-ridden. (R. at 21 – 33). The first – and only – indication in the medical record that Plaintiff was so severely restricted was in Dr. Gent's functional assessment. Moreover, it was directly at odds with many of the specific limitations findings of Dr. Demby following his examination of Plaintiff.

In cases such as this, involving contrary medical findings, "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them." *Cotter v. Harris*, 642 F. 2d 700, 705 (3d Cir. 1981). The ALJ must provide an explanation supported by substantial evidence to justify the rejection of pertinent evidence. *Fargnoli v. Massanari*, 247 F. 3d 34, 43 (3d Cir. 2001). However, substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F. 3d 501, 503 (3d Cir. 2004). In this Court's estimation, the ALJ met this burden, here, and pointed not only to inconsistencies between the record and Dr. Gent's conclusions, but to a more general lack of support within the record for Dr. Gent's severe findings.

As to the ALJ's treatment of Dr. Zulovich's assessment, the Court finds the ALJ's decision properly supported by substantial evidence. Dr. Zulovich indicated that Plaintiff would have marked limitation with carrying out detailed instruction, responding appropriately to pressures in a usual work setting, and responding to changes in a routine work setting. (R. at 497). Dr. Zulovich further opined that Plaintiff had short-term memory issues and difficulty

focusing. (R. at 497 – 98). Plaintiff claims that disregarding these findings in favor of less severe findings by state agency consultant Dr. Melcher was in error. (Docket No. 8 at 10 – 12). This Court first notes that the opinions of state agency evaluators such as Dr. Melcher "merit significant consideration." *Chandler*, 667 F. 3d at 361. However, notwithstanding the appropriateness of the consideration accorded Dr. Melcher by the ALJ, it is noteworthy that the ALJ's RFC already accommodated Dr. Zulovich's marked finding with respect to carrying out detailed instruction, and her concern for Plaintiff's short-term memory, by limiting Plaintiff to jobs involving only understanding, remembering, and carrying out simple instructions and performing simple, routine tasks. Plaintiff also fails to explain how this limitation would not accommodate Dr. Zulovich's concern for Plaintiff's ability to concentrate and focus. Moreover, Plaintiff fails to demonstrate – through citation to the record – where Dr. Zulovich draws support for her conclusions regarding Plaintiff's ability to respond appropriately to pressures in a usual work setting and respond to changes in a routine work setting. The ALJ relied upon Dr. Melcher's assessment which found that there was no evidence to support a marked finding in these areas, and neither Dr. Zulovich in her check-box form, nor Plaintiff in her brief, provide such objective supporting evidence. *See Mason v. Shalala*, 994 F. 2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best," particularly when unaccompanied by thorough written reports); *Schmidt v. Comm'r of Soc. Sec.*, 465 F. App'x 193, 197 (3d Cir. 2012) ("In order to give significant weight to a physician's opinion, the ALJ must consider the opinion's supportability and consistency with the record as a whole."). As such, the Court will not hold that the ALJ's reliance upon the findings of Dr. Melcher when formulating his RFC constituted error requiring remand.

Finally, Plaintiff contends that it was error for the ALJ to discount the credibility of Plaintiff's personal averments of pain and limitation due to physical and mental impairments. (Docket No. 8 at 12 – 15). The United States Court of Appeals for the Third Circuit has held that an ALJ should accord subjective complaints of pain similar treatment as objective medical reports, and weigh the evidence before him. *Burnett v. Comm'r of Soc. Sec.*, 220 F. 3d 112, 122 (3d Cir. 2000). Serious consideration must be given to subjective complaints of pain where a medical condition could reasonably produce such pain. *Mason*, 994 F. 2d at 1067 – 68. The ALJ is required to assess the intensity and persistence of a claimant's pain, and determine the extent to which it impairs a claimant's ability to work. *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999). This includes determining the accuracy of a claimant's subjective complaints. *Id.* While pain itself may be disabling, and subjective complaints of pain may support a disability determination, allegations of pain suffered must be consistent with the objective medical evidence on record. *Ferguson v. Schweiker*, 765 F. 2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F. 3d at 122.

The ALJ questioned the sincerity of Plaintiff's complaints for a number of reasons. First, Dr. Mitra noted on a number of occasions spanning several years of treatment that Plaintiff was not fully compliant with her medication regimen. (R. at 30 – 33). As such, the ALJ made the adverse, and supported, inference that Plaintiff's limitations were not as severe as she personally claimed. *See Toland v. Colvin*, 2013 WL 6175817 at *12 (W.D. Pa. Nov. 25, 2013) ("An ALJ is permitted to consider a claimant's treatment history in assessing credibility... Likewise, '[a]n ALJ may treat a claimant's noncompliance with a treatment plan as a factor' that adversely affects the claimant's credibility.") (citations omitted).

Secondly, the ALJ looked at inconsistencies between Plaintiff's personal claims and the objective medical evidence on record. For instance, despite a claimed need for such, and documented use of such on one occasion by Dr. Gent, there are no medical sources indicating that Plaintiff needed a walker or wheelchair on more than rare occasions, and no such devices were ever prescribed. (R. at 30 – 33). Plaintiff claimed that she owned a tanning bed and tanned in order to combat the effects of seasonal affective disorder, yet there was no record of such a diagnosis. (R. at 30 – 33). In spite of claims that Plaintiff had difficulty being in public and leaving her home, she was able to obtain a professional manicure and pedicure. (R. at 30 – 33). Despite her claims to the contrary, there were no objective reports that Plaintiff was bed-ridden due to pain. (R. at 30 – 33). Further, in spite of Plaintiff's personal complaints to this effect, there was little to no objective evidence indicating that Plaintiff actually suffered from significant visual deficits, balance deficits, weakness, swelling, and significant memory loss. (R. at 30 – 33). While not all of these inconsistencies are substantial, the collective effect upon Plaintiff's credibility is significant in the ALJ's eyes, and correctly so. *See Hartranft*, 181 F. 3d at 362 ("Allegations of pain and other subjective symptoms must be supported by objective medical evidence").

## VI. CONCLUSION

Based upon the foregoing, the ultimate decision by the ALJ to deny benefits to Plaintiff was adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is

denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: January 21, 2014
cc/ecf: All counsel of record.